851 F.2d 1020
 57 USLW 2041, 1988-1 Trade Cases 68,107,
11 Fed.R.Serv.3d 647
 HEALTH CARE EQUALIZATION COMMITTEE OF THE IOWA CHIROPRACTIC
SOCIETY as assignee of its members, Appellant,
v.
IOWA MEDICAL SOCIETY, Iowa Hospital Association; Blue
Shield of Iowa; Blue Cross of Iowa, American Medical
Association, American Hospital Association, Joint Commission
on Accreditation of Hospitals; Clarence H. Denser, Jr.,
M.D.; Joseph A. Sabatier, Jr., M.D.; H. Doyl Taylor;
Donald C. Young, M.D.; and Nelson H. Chesney, M.D.,
American College of Radiology, Appellees.
HEALTH CARE EQUALIZATION COMMITTEE OF THE IOWA CHIROPRACTIC
SOCIETY as assignee of its members, Appellee,
v.
IOWA MEDICAL SOCIETY, Iowa Hospital Association; Blue
Shield of Iowa; Blue Cross of Iowa; Appellants.
American Medical Association; American Hospital
Association; Joint Commission on Accreditation of
Hospitals; Clarence H. Denser, Jr., M.D.; Joseph A.
Sabatier, Jr., M.D.; H. Doyl Taylor; Donald C. Young,
M.D.; and Nelson H. Chesney, M.D.
 Nos. 86-2588, 87-1015.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 31, 1987.
Decided June 24, 1988.
Rehearing and Rehearing En Banc Denied Sept. 20, 1988.
 
 Flenn L. Norris, Des Moines, Iowa, for Health Care Equalization Committee of the Iowa Chiropractic Soc.
 Craig Graziano, Des Moines, Iowa, for Blue Cross/Blue Shield.
 Bennett A. Webster, Des Moines, Iowa, for Iowa Hosp. Assn.
 Charles S. Treat, Chicago, Ill., for American College of Radiology.
 Before McMILLIAN, JOHN R. GIBSON and FAGG, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Health Care Equalization Committee (HCEC) appeals from a final judgment entered in the District Court[1] for the Southern District of Iowa dismissing its antitrust claims against Blue Cross and Blue Shield of Iowa (the Blues) and the American College of Radiology (the ACR), granting summary judgment in favor of the Iowa Hospital Association (the IHA), and denying its motion for summary judgment on its group boycott claim. Health Care Equalization Comm. v. Iowa Medical Society, 501 F.Supp. 970, 984-86, 988-91, 993-95 (S.D. Iowa 1980) (HCEC v. IMS ); id., Civ. No. 79-381-A, slip op. at 2-5, 8-10 (Aug. 4, 1986). For reversal, HCEC argues that the district court erred in (1) dismissing its antitrust claims against the Blues by finding them exempt from the antitrust laws under the state action doctrine and the McCarran-Ferguson Act; (2) dismissing the ACR for lack of personal jurisdiction; (3) granting summary judgment in favor of the IHA; and (4) denying its motion for summary judgment on its group boycott claim. For the reasons discussed below, we affirm.
 
 
 2
 * HCEC is a committee of the Iowa Chiropractic Society, and an assignee of the claims of one hundred and twenty Iowa chiropractors. In 1979 HCEC brought this action against the Blues, the ACR, the IHA, and other defendants[2] alleging violations of sections 1 and 2 of the Sherman Act. 15 U.S.C. Secs. 1, 2.[3] HCEC charged that the defendants had conspired in violation of Sec. 1 of the Sherman Act to eliminate or prevent the growth of the chiropractic profession through a group boycott or concerted refusal to deal with chiropractors. HCEC alleged that the boycott was manifested in many ways, including (1) refusal to permit medical doctors to refer patients to chiropractors, to accept patient referrals from chiropractors, or to treat patients in cooperation with chiropractors; (2) denial of access to hospitals and hospital services to chiropractors; (3) attempts to block accreditation of chiropractic educational institutions; (4) promotion of public statements critical of chiropractors; and (5) refusal to include coverage for chiropractic services in health care service plans. Additionally, HCEC alleged that the Blues monopolized, attempted to monopolize, and conspired to monopolize the "health care insurance business in Iowa" in violation of Sec. 2 of the Sherman Act.
 
 
 3
 After approximately eight months of discovery, the Blues filed a motion to dismiss the antitrust allegations as to them. The Blues claimed to be exempt from the federal antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015, and the state action doctrine of Parker v. Brown, 317 U.S. 341, 350-52, 63 S.Ct. 307, 313-14, 87 L.Ed. 315 (1943). The ACR filed a motion to dismiss for lack of personal jurisdiction.[4] In a comprehensive ruling, the district court held that the Blues were exempt from the Sec. 1 group boycott claim due to the state action doctrine, HCEC v. IMS, 501 F.Supp. at 988-91, and from the Sec. 2 monopolization claim on the basis of the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015. Id. at 993-95. The district court also granted the ACR's motion to dismiss for lack of personal jurisdiction because the ACR did not have sufficient minimum contacts with Iowa to satisfy the requirements of the due process clause of the fourteenth amendment.
 
 
 4
 Id. at 980-82.
 
 
 5
 Discovery involving the remaining defendants and claims proceeded throughout the early 1980s and ended in January 1986. Both HCEC and the IHA then moved for summary judgment on the group boycott claim. On August 4, 1986, the district court denied HCEC's motion for summary judgment, adopting a rule of reason approach to group boycott claims involving professional associations, and granted the IHA's motion for summary judgment because the undisputed facts revealed that the IHA was not involved in the alleged group boycott.[5] This appeal followed.
 
 II
 
 6
 HCEC's first point on appeal is that the district court erred in dismissing its group boycott and monopolization claims against the Blues under the state action doctrine and the McCarran-Ferguson Act. We turn first to the state action doctrine.
 
 
 7
 * The Blues are non-profit health care service corporations organized under Iowa Code Chapters 504 and 504A and governed by Iowa Code Chapter 514 in the administration of their health care service plans. These plans provide an alternative to traditional health insurance plans and revolve around two sets of contracts: provider contracts and subscriber contracts. Subscriber contracts obligate the Blues to provide to subscribers for a fixed fee various health care services through participating health care providers. Through the provider contracts, the Blues are obligated to reimburse participating health care providers for their fees and expenses in providing health care services to the Blues' subscribers. The history and development of the Blues is described in greater detail in Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 239-243, 99 S.Ct. 1067, 1087-1089, 59 L.Ed.2d 261 (1979) (Brennan, J., dissenting). HCEC focuses its group boycott claim on the failure of the Blues to include chiropractors within their health care service plans--that is, the failure to include chiropractic services among those health care services which the Blues are obligated to provide under their subscriber contracts.
 
 
 8
 The Blues defend this exclusion by pointing to the regulatory framework governing health care service corporations set forth in Iowa Code Chapter 514, which the Blues assert mandates the exclusion of chiropractors. Thus, the Blues argue that the actions complained of by HCEC are actually those of the State of Iowa and therefore not subject to the Sherman Act under the state action doctrine.
 
 
 9
 In analyzing the Blues' defense under the state action doctrine, we begin with Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). There, a raisin producer sought to enjoin the enforcement of an agricultural marketing program administered pursuant to state legislation intended to create price supports for various commodities, including raisins. The Court assumed for purposes of analysis that the program would have anti-competitive effects, but nevertheless concluded that Congress did not intend the Sherman Act to apply to the program because it "derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command." Id. at 350, 63 S.Ct. at 313. The Court based its decision both on federalism concerns and the legislative history of the Sherman Act.
 
 
 10
 We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
 
 
 11
 Id. at 350-51, 63 S.Ct. at 313.
 
 
 12
 After more than thirty years, the Court returned to the state action doctrine in a series of cases. Goldfarb v. Virginia State Bar, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975) (minimum fee schedule issued by county bar association and enforced by state bar, an administrative agency, not protected by state action doctrine because fee schedule not "compelled by direction of the State acting as a sovereign"); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (state's neutral acceptance of public utility's program of providing free light bulbs not protected by state action doctrine); Bates v. Arizona State Bar, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (state action doctrine protects state supreme court enforcement of disciplinary rules prohibiting attorney advertising); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (state action doctrine protects acts of municipalities only where undertaken pursuant to clearly articulated state policy of displacing competition by regulation); New Motor Vehicle Board v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (same); California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (Midcal ) (state legislated resale wine-pricing maintenance program not protected by state action doctrine because, although restraint clearly articulated and affirmatively expressed as state policy, not actively supervised by the state itself).
 
 
 13
 In Sound, Inc. v. American Telephone & Telegraph Co., 631 F.2d 1324 (8th Cir.1980), this court distilled from the above cases four factors relevant to the application of the state action doctrine.[6] These factors were applied by the district court in its 1980 ruling that the Blues' conduct was protected under the state action doctrine.
 
 
 14
 The law regarding the state action doctrine has not remained static since the district court's rulings. In Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (Southern Motor Carriers), and 324 Liquor Corp. v. Duffy, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (324 Liquor Corp.), the Court clarified the doctrine by holding that only the two factors considered in Midcal make up the test for protection under the state action doctrine: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Midcal, 445 U.S. at 105, 100 S.Ct. at 943 (quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (plurality opinion)); see also 324 Liquor Corp., 107 S.Ct. at 725; Southern Motor Carriers, 471 U.S. at 57, 105 S.Ct. at 1726. Most recently in Patrick v. Burget, --- U.S. ----, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988) (Patrick), the Court noted that "[t]he active supervision prong of the Midcal test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." Although the four-factor test of Sound, Inc. applied by the district court has been superseded, we conclude that the Blues are protected by the state action doctrine under the current two-pronged test.
 
 
 15
 Turning first to state policy, we conclude that Iowa Code Chapter 514[7] reflects a clearly articulated and affirmatively expressed state policy to displace competition with regulation in the health care service corporation industry, and provides an extensive and complex regulatory framework for the activities of health care service corporations such as the Blues. Section 514.1 authorizes such corporations to administer four types of plans: (1) a hospital service plan "whereby hospital service may be provided by the said corporation or by a hospital with which it has a contract for such service, to such of the public who become subscribers to said plan under a contract which entitles each subscriber to hospital service"; (2) a medical and surgical service plan "whereby medical and surgical service may be provided at the expense of said corporation, by duly licensed physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons, to subscribers under contract, entitling each subscriber to medical and surgical service, as provided in said contract"; (3) a pharmaceutical plan; and (4) an optometric plan.
 
 
 16
 Under Sec. 514.5, hospital service corporations are authorized to contract with subscribers "for the rendering of hospital service to any of its subscribers with hospitals maintained and operated by the state or any of its political subdivisions, or by any corporation, association, or individual." This section also authorizes medical service corporations to "enter into contracts with subscribers to furnish medical and surgical service through physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons."
 
 
 17
 Chapter 514 does not stop at merely specifying the types of contracts that health care service corporations may enter into. Under Sec. 514.7, any contracts between a health care service corporation and its subscribers are "at all times" subject to the approval of the Iowa Commissioner of Insurance (the Commissioner). Similarly, Sec. 514.8 provides:
 
 
 18
 The contracts by any [health care service] corporation with participating hospitals for hospital service or with participating physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons for medical and surgical service, or with participating pharmacies for pharmaceutical service, or with participating optometrists for optometric service shall at all times be subject to the approval of the commissioner of insurance.
 
 
 19
 The articles of incorporation of the health care service corporation itself, as well as any subsequent amendments thereto, are subject to the approval of the Commissioner. Sec. 514.3. The Commissioner must also approve the rates charged to subscribers, Sec. 514.6, approve all acquisition and administrative costs of the corporations, Sec. 514.11, arbitrate any disputes between a corporation and its providers, Sec. 514.13, and supervise any dissolution, merger or liquidation of a health care service corporation, Sec. 514.14. Under Sec. 514.17, the legislature has further specified the minimum number of each type of health care provider which must be under contract with the corporation. Finally, all health care service corporations must report annually to the Commissioner under Sec. 514.9, and are subject to examination under Sec. 514.10. In sum, Chapter 514 regulates every aspect of the health care service corporation industry from the structure, expenditures, and contracts of the corporations to the rates that they may charge their subscribers.
 
 
 20
 HCEC argues, however, that even if the Blues are protected by the state action doctrine to the extent that their conduct is pursuant to the provisions of Chapter 514, they are nevertheless liable for their boycott of chiropractors because the exclusion of chiropractors from health care service plans is not contemplated or compelled by Chapter 514.[8] We agree with the district court's reasoning in rejecting this argument because "Chapter 514 on its face removes any discretion or business judgment with respect to coverage by health care service corporations of chiropractic services." HCEC v. IMS, 501 F.Supp. at 990.
 
 
 21
 As a threshold matter, we note that it is not necessary for Chapter 514 to expressly compel health care service corporations to exclude chiropractors from their service plans in order for the corporations to be protected by the state action doctrine. Southern Motors Carriers, 471 U.S. 48, 105 S.Ct. 1721. "A private party acting pursuant to an anticompetitive regulatory program need not 'point to a specific, detailed legislative authorization' for its challenged conduct." Id., 471 U.S. at 64, 105 S.Ct. at 1730 (quoting Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978) (plurality opinion)) It is sufficient that the legislature " 'contemplated the kind of action complained of.' " Lafayette, 435 U.S. at 415, 98 S.Ct. at 1138 (plurality opinion) (citation omitted); see also Capital Telephone Co. v. New York Telephone Co., 750 F.2d 1154, 1162 (2d Cir.1984). Here, however, it is clear from the language and history of Chapter 514 that the exclusion of chiropractors from health care service plans was not merely contemplated by the State of Iowa, but compelled.
 
 
 22
 Health care service corporations were first authorized to provide medical and surgical service plans to subscribers in 1945.[9] 1945 Iowa Acts Ch. 209, Sec. 1. This law limited the authorized plans to the services of "physicians and surgeons, osteopathic physicians, or posteopathic physicians and surgeons." Id. The legislature on several occasions has expanded this authorization to include other services. Dental services were added in 1955. 1955 Iowa Acts Ch. 244, Sec. 1. In 1965 podiatric services were added. 1965 Iowa Acts Ch. 397, Sec. 1. Pharmaceutical services were added in 1967, 1967 Iowa Acts Ch. 369, Sec. 1, and two years later optometric services were added. 1969 Iowa Acts Ch. 271, Sec. 1. It was not until 1986, however, that the Iowa legislature chose to include chiropractic services within those services authorized to be provided by health care service corporations. 1986 Iowa Acts Ch. 1180, Sec. 3. We agree with the district court that "the omission of any mention of chiropractic coverage [until 1986] in Chapter 514 directly suggests that the legislature intended to prohibit coverage of their activities by health care service corporations." HCEC v. IMS, 501 F.Supp. at 990.
 
 
 23
 This interpretation of Chapter 514 is supported by opinions issued by both the Attorney General and the Governor of Iowa. In March 1979 the Iowa Attorney General stated:
 
 
 24
 Being creatures of statutes, service corporations under Section 514.1 can contract for these services only and only with those persons or entities listed in Chapter 514; hospitals or corporations, associations, or individuals providing hospital service; physicians and surgeons; dentists; podiatrists; osteopathic physicians and surgeons; pharmacies; and optometrists.
 
 
 25
 Op.Att'y Gen. (Mar. 31, 1979). Later that year, Governor Robert D. Ray opined that "eligibility for [chiropractic] benefit under Chapter 514 is prevented as a matter of law" and "eligibility for Blue Cross and Blue Shield benefits must be by statutory revision." II Iowa Admin. Bull., No. 9, at 527 (1979). Iowa law as of 1980 clearly excluded chiropractic services from coverage in health care service corporations. We therefore conclude that the Blues' conduct in excluding chiropractors from their health care service plans was undertaken pursuant to a clearly articulated and affirmatively expressed policy of the State of Iowa.
 
 
 26
 Turning to the second prong under Midcal, active state supervision, we conclude that Iowa actively supervises the health care service corporations' conduct under its regulatory scheme. Not only does the statute require each corporation to report annually to the Commissioner and remain subject to examination, but the Commissioner also approves every contract entered into by the corporations, including the actual rates charged to the subscribers. The Commissioner's role and authority in reviewing contracts and rates is quite different from the regulatory programs considered in Midcal, 324 Liquor Corp., and Patrick, where the Court found no active state supervision. In those cases, the state neither established nor reviewed the alleged anticompetitive conduct, and did not "monitor market conditions or engage in any 'pointed reexamination' of the program." Midcal, 445 U.S. at 106, 100 S.Ct. at 943 (quoting Bates v. State Bar, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977)); see Patrick, 108 S.Ct. at 1663; 324 Liquor Corp., 107 S.Ct. at 726 (1987). Here, by contrast, the Commissioner's supervision is extensive and continuing, and is much more than a "gauzy cloak of state involvement" cast over the health care service corporations' activities. Cf. Midcal, 445 U.S. at 106, 100 S.Ct. at 943 (state legislated resale wine-pricing maintenance program not actively supervised by state itself). The Commissioner reviews all contracts of the Blues and has the authority to disapprove any provider contracts between the Blues and chiropractors. We thus conclude that Iowa Code Chapter 514 satisfies both prongs of the Midcal state action test. The district court did not err in holding that the Blues' compliance with the legislative mandate of Iowa to "refuse to deal" with chiropractors is exempt from antitrust scrutiny under the state action doctrine.[10]
 
 B
 
 27
 We next consider HCEC's argument that the district court erred in dismissing its Sec. 2 monopolization claim against the Blues under the McCarran-Ferguson Act. HCEC alleged that the Blues had monopolized, attempted to monopolize, and conspired to monopolize "[t]he health care insurance business in Iowa." Specifically, HCEC alleged that the Blues "have taken over coverage of groups of patients previously afforded third party coverage for chiropractic services by private insurers, thereby creating an economic bias favoring competing medical doctors, depriving the insured Iowans of a reasonable election between chiropractic and medical health care, and depriving [HCEC's assignors] of patients and income." The district court dismissed these allegations, concluding that the Blues were exempt from scrutiny under Sec. 2 of the Sherman Act pursuant to the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015, because the Blues were engaged in the "business of insurance" and regulated by state law. HCEC v. IMS, 501 F.Supp. at 993-95.
 
 
 28
 The McCarran-Ferguson Act removes from antitrust scrutiny all conduct which is (1) part of the "business of insurance," (2) regulated by state law, and (3) not in the form of coercion, intimidation, or boycott. 15 U.S.C. Secs. 1012(b), 1013(b); Hahn v. Oregon Physicians Service, 689 F.2d 840, 841-42 (9th Cir.1982); Virginia Academy of Clinical Psychologists v. Blue Shield, 624 F.2d 476, 483 (4th Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). The first question is thus whether the Blues' conduct in allegedly monopolizing the market for health care services in Iowa is part of the "business of insurance." The Supreme Court has set forth three factors to examine in determining whether a particular practice is part of the "business of insurance": (1) whether the practice has the effect of transferring or spreading a policyholder's risk, (2) whether the practice is an integral part of the policy relationship between the insurer and the insured, and (3) whether the practice is limited to entities within the insurance industry. Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982); Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). While each of these factors is a relevant consideration in evaluating whether a practice is part of the "business of insurance," "[n]one of these criteria is necessarily determinative in itself." Pireno, 458 U.S. at 129, 102 S.Ct. at 3009.
 
 
 29
 In applying these three factors to the present case, we emphasize that we consider only the Sec. 2 aspect of HCEC's complaint which alleges that the Blues have monopolized the Iowa health insurance market, thereby injuring HCEC by reducing the market share of those insurance companies who cover chiropractic services. These allegations are essentially aimed at the contractual relationship between the Blues as insurers and their Iowa subscribers as insureds. We conclude that these contracts with subscribers, and the extent to which the Blues may have attained a dominant position in the market for these contracts, are an integral part of the "business of insurance" within the meaning of the McCarran-Ferguson Act.
 
 
 30
 The contracts between the Blues and their subscribers clearly have the effect of transferring or spreading a subscriber's risk. Subscribers pay a fixed premium to the Blues, unrelated to the actual health care expenses which are borne by the Blues. This is a classic insurance relationship. In this respect, the Blues' contracts with their subscribers may be sharply contrasted with their contracts with participating health care providers. In Royal Drug, the Court characterized the Blues' contracts with their providers as "merely arrangements for the purchase of goods and services by Blue Shield." Royal Drug, 440 U.S. at 214, 99 S.Ct. at 1075. The Court also observed that provider contracts were not between the insurer and the insured, but rather involved the insurer and a third party. Id. at 215-16, 99 S.Ct. at 1075. Accordingly, the Court concluded that the provider contracts were not a part of the "business of insurance" under the McCarran-Ferguson Act. Id. The Court was careful, however, to distinguish the Blues' provider contracts from their subscriber contracts: "This is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements ..., may not be the 'business of insurance' within the meaning of the [McCarran-Ferguson] Act." Id. at 230 n. 37, 99 S.Ct. at 1082 n. 37. This distinction was also noted in the dissenting opinion of Justice Brennan:
 
 
 31
 I start with common ground. Neither the Court nor the parties challenge the fact that the ... policy offered by Blue Shield to its policyholders--as distinguished from the contract between Blue Shield and the [providers]--is the "business of insurance." Whatever the merits of scholastic argument over the technical definition of "insurance," the policy both transfers and distributes risk. The policyholder pays a sum certain--the premium--against the risk of the uncertain contingency of illness, and if the company has calculated correctly, the premiums of those who do not fall ill pay the costs of benefits above the premiums of those who do.
 
 
 32
 Id. at 239, 99 S.Ct. at 1087 (Brennan, J., dissenting) (citation omitted). We find this distinction to be of critical importance in assessing whether the Blues' subscriber contracts are the "business of insurance." Unlike the provider contracts, pursuant to which the Blues merely procure services from providers for their subscribers, the subscriber contracts involve the sharing and spreading of risk.
 
 
 33
 Turning to the second and third factors under Pireno, it is clear that the contracts between the Blues and their subscribers are "an integral part of the policy relationship between the insurer and the insured" and that these contracts are "limited to entities within the insurance industry." Indeed, these contracts are the policy relationship between the insurer and insured, and, by definition, are limited to insurance entities. We conclude that the contractual relationship between the Blues and their subscribers is part of the "business of insurance" within the meaning of the McCarran-Ferguson Act.
 
 
 34
 Focusing on the second aspect of exemption under the McCarran-Ferguson Act, we have little difficulty in concluding that the contractual relationship between the Blues and their subscribers is regulated by state law. As discussed above, these contracts, as well as the rates contained in them, are approved by the Iowa Commissioner of Insurance. See Iowa Code, Secs. 514.6, .7. Finally, HCEC's claim that the Blues monopolized, attempted, and conspired to monopolize the Iowa health care insurance market does not allege that the Blues' conduct took the form of coercion, intimidation, or boycott within the meaning of the McCarran-Ferguson Act, 15 U.S.C. Sec. 1013(b).[11] Accordingly, we conclude that the district court did not err in dismissing HCEC's Sec. 2 monopolization claim against the Blues as exempt under the McCarran-Ferguson Act.
 
 III
 
 35
 HCEC's next point on appeal is that the district court erred in granting the ACR's motion to dismiss for lack of personal jurisdiction. HCEC asserted jurisdiction over the ACR pursuant to the Iowa long-arm statute,[12] which provides in relevant part:
 
 
 36
 If a foreign corporation ... commits a tort in whole or in part in Iowa against a resident of Iowa, such acts shall be deemed to be doing business in Iowa by such foreign corporation for the purpose of service of process or original notice on such foreign corporation under this section, and, if the corporation does not have a registered agent or agents in the state of Iowa, shall be deemed to constitute the appointment of the secretary of state of the state of Iowa to be its true and lawful attorney upon whom may be served all lawful process or original notice in actions or proceedings arising from or growing out of such ... tort.
 
 
 37
 Iowa Code Sec. 617.3 (Supp.1988). The district court assumed, for purposes of its analysis, that the ACR's alleged conduct fell within the Iowa long-arm statute, but concluded that the exercise of personal jurisdiction over the ACR would not be consistent with due process. HCEC v. IMS, 501 F.Supp. at 984-86.
 
 
 38
 On the basis of unrebutted testimony, the district court found the following facts regarding the ACR's contacts with Iowa:ACR has no office in Iowa, is not licensed to do business in Iowa, has no agent or property in Iowa, makes no purchases in Iowa, and has held no seminars, workshops or other meetings in Iowa. The governing body of the organization, the Board of Chancellors, has never met in Iowa and no employees of ACR reside in Iowa. Even though [HCEC] alleges in its resistance that ACR is involved in an ongoing process of certifying radiologists and hospitals, it offers no supporting evidence. The Court finds on the basis of [a] supplemental affidavit attached to ACR's reply memorandum that ACR is not involved in the licensing, certifying or accreditation of hospitals or radiologists. ACR has less than 1% of its membership residing in Iowa. It makes membership mailings but does not "solicit, advertise, promote, or otherwise conduct any of its activities in Iowa", although some of its mailings go to persons who are not members.
 
 
 39
 Id. at 980-81.[13] The district court concluded that these facts did not demonstrate sufficient "minimum contacts" between the ACR and the State of Iowa so that the assertion of personal jurisdiction over the ACR would be consistent with "traditional notions of fair play and substantial justice." Id.; see International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).
 
 
 40
 In determining whether there are sufficient minimum contacts to satisfy due process, we focus on the " 'relationship among the defendant, the forum, and the litigation.' " Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)); Institutional Food Marketing Assocs., Ltd. v. Golden State Strawberries, Inc., 747 F.2d 448, 455 (8th Cir.1984). This inquiry involves a consideration of five factors: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of the defendant's contacts with the forum state; (3) the relation of the cause of action to the defendant's contacts with the forum state; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Institutional Food Marketing, 747 F.2d at 455; Scullin Steel Co. v. National Ry. Utilization Corp., 676 F.2d 309, 313 n. 4 (8th Cir.1982). The first three factors are of paramount importance. Id.; Aaron Ferer & Sons Co. v. American Compressed Steel Co., 564 F.2d 1206, 1210 n. 5 (8th Cir.1977).
 
 
 41
 Reviewing the nature and quality of the ACR's contacts with Iowa, we agree with the district court that "the only contacts ACR had established with Iowa related to the existence and servicing of resident members" of the ACR. HCEC v. IMS, 501 F.Supp. at 985. The quality of these contacts was nothing more than the residence of ACR members in Iowa and the mailing of materials related to membership into the state. Under the second factor, the ACR's contacts with Iowa were also quite limited. About one hundred and twenty ACR members reside in Iowa, making up less than one percent of the total ACR membership. The third factor is equally unsupportive of jurisdiction because the ACR's contacts with Iowa, i.e., the residence of members and membership mailings, are greatly attenuated from HCEC's allegations against the ACR. These allegations center on the ACR's adoption of a code of ethical principles for its members based upon the Principles of Medical Ethics of the American Medical Association, which prohibits professional association with chiropractors. HCEC draws no direct connection between the ACR's adoption of its code of ethical principles and the ACR's limited activities in Iowa. We do not find any considerations that suggest that the ACR's " 'conduct and connection with the forum State are such that [the ACR] should reasonably [have] anticipate[d] being haled into court there.' " Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980)). We hold that the district court did not err in concluding that it could not exercise personal jurisdiction over the ACR on HCEC's allegations.[14]
 
 IV
 
 42
 HCEC's third argument is that the district court erred in granting summary judgment to the IHA. HCEC alleged in its complaint that the IHA, as a "state-wide trade association in the health care field" and "an affiliated constituent society of the AMA composed of hospitals in the State of Iowa," conspired to boycott chiropractors by refusing to permit its member hospitals "to deal in goods or services with chiropractic doctors operating within the terms of their Iowa licenses." The IHA denied these allegations in an affidavit asserting that (1) the IHA is not affiliated with the AMA, (2) the IHA has absolutely no authority or control over its member hospitals either in promulgating rules for its member hospitals or in determining the policies of its member hospitals with regard to staff or clinical privileges, and (3) the IHA has no rules or policies against the granting of staff or clinical privileges to chiropractors. HCEC, which failed to depose any representative of the IHA, attempted to rebut the IHA's affidavit with evidence tending to show that on one occasion a representative of one hospital met with a representative of the IHA regarding an application by a chiropractor for hospital privileges. The district court concluded that this evidence failed to raise a genuine issue of material fact precluding the entry of judgment under Fed.R.Civ.P. 56[15] in favor of the IHA.
 
 
 43
 We begin our consideration of the district court's application of Rule 56 with a review of recent Supreme Court decisions on the legal standards applicable to motions for summary judgment in antitrust cases. The Court has said that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). To survive a motion for summary judgment, the non-moving party "must establish that there is a genuine issue of material fact as to whether [the moving party] entered into an illegal conspiracy that caused [the non-moving party] to suffer a cognizable injury." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986) (citations omitted). "Second, the issue of fact must be 'genuine.' When the moving party has carried its burden [of demonstrating the absence of a genuine issue of material fact], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S.Ct. at 1356 (citations omitted). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in Matsushita ). Finally, "antitrust law limits the range of permissible inferences from ambiguous evidence in a Sec. 1 case.... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of Sec. 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Id. at 588, 106 S.Ct. at 1357 (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)). Most significantly for this case, the non-moving party "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" the non-moving party. Id.
 
 
 44
 In applying the above principles to the facts before us, we conclude that summary judgment was properly entered. HCEC's evidence to the effect that an IHA-member hospital once consulted the IHA about a chiropractor seeking staff privileges does not rise above the level of a "metaphysical doubt" as to whether IHA, an entity with no other connections to the other members of the alleged conspiracy, was actually engaged in a conspiracy to boycott chiropractors. HCEC's evidence certainly did not tend to exclude the possibility that the IHA acted independently or in a manner that could not have harmed HCEC. On the evidence in the record, an inference of conspiracy is no more reasonable than an inference that the IHA was not a part of any concerted activity to boycott chiropractors. The district court did not err in "secur[ing] the just, speedy and inexpensive determination" of this action by granting summary judgment in favor of the IHA.
 
 V
 
 45
 The judgment of the district court is affirmed.[16]
 
 
 
 [1]
 The Honorable William C. Stuart, United States Senior District Judge for the Southern District of Iowa
 
 
 [2]
 HCEC also named as defendants the American Medical Association, the American Hospital Association, the Iowa Medical Society, the Joint Commission on Accreditation of Hospitals, then Iowa Commissioner of Public Health Norman L. Pawlewski, H. Doyl Taylor, Donald C. Young, M.D., Nelson H. Chesney, M.D., Clarence R. Denser, Jr., M.D., and Joseph Sabatier, Jr., M.D. As a result of various settlement agreements and unappealed orders of the district court, these defendants are no longer parties to this lawsuit
 
 
 [3]
 HCEC also alleged violations of (1) the Iowa common law of tort due to interference with prospective business relations, and (2) 42 U.S.C. Sec. 1983. In 1986 the district court granted HCEC's motion to dismiss its tortious interference claim, Health Care Equalization Comm. v. Iowa Medical Soc'y, Civ. No. 79-381-A (S.D.Iowa Aug. 4, 1986) (HCEC v. IMS ), and entered summary judgment in favor of all defendants on the Sec. 1983 claim. Id. (Aug. 8, 1986) (the Blues); id. (Aug. 13, 1986) (remaining defendants). HCEC does not appeal from these orders
 
 
 [4]
 All defendants joined in a motion to dismiss on the ground that HCEC lacked standing and the capacity to bring this lawsuit. The district court denied this motion. HCEC v. IMS, 501 F.Supp. at 976-80. Appellees assert that the district court erred in denying this motion and raise this point of error in what purports to be a cross-appeal (No. 87-1015). Because it would be unnecessary to reach this argument if we affirm the district court on all aspects of appellant's appeal, we construe appellees' argument to be in the nature of an alternative basis for affirmance. We dispose of this issue infra, note 16
 
 
 [5]
 The district court certified its November 5, 1980, and August 4, 1986, rulings for interlocutory appeal. See 28 U.S.C. Sec. 1292(b). Because all other defendants have been dismissed, these rulings have become final; accordingly, we exercise jurisdiction over this appeal pursuant to 28 U.S.C. Sec. 1291
 
 
 [6]
 The four factors set forth in Sound, Inc. were:
 [1 T]he existence and nature of any relevant statutorily expressed policy; the nature of the regulatory agency's interpretation and application of its enabling statute, including the accommodation of competition by the regulator; the fairness of subjecting a regulated private defendant to the mandates of antitrust law; and the nature and extent of the state's interest in the specific subject matter of the challenged activity.
 Id. at 1334.
 
 
 [7]
 All discussions of Iowa Code Chapter 514, unless otherwise noted, refer to the Chapter as it read in 1979 at the time of HCEC's suit. Subsequent amendments are discussed where relevant
 
 
 [8]
 HCEC also appears to argue that the Blues were not obligated to exclude chiropractors because they sometimes made reimbursements to their subscribers for services performed by nonparticipating providers. The district court rejected this argument because, in its view, such reimbursements are permissible under Chapter 514. HCEC v. IMS, 501 F.Supp. at 990-91. We do not find the question of whether the Blues in practice reimbursed their subscribers for the services of nonparticipating providers to be particularly relevant to the question of whether Chapter 514 authorizes the Blues to include chiropractors within their plans
 
 
 [9]
 Chapter 514, as originally enacted in 1939, authorized hospital service plans only. 1939 Iowa Acts Ch. 222, Sec. 1
 
 
 [10]
 Implicit in this holding is our view that Sec. 1013(b) of the McCarran-Ferguson Act does not express a congressional intent to subject state-authorized boycott activity to the antitrust laws where conducted as part of a state-regulated "business of insurance." This question was left open by the Supreme Court in St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 554 n. 27, 98 S.Ct. 2923, 2936 n. 27, 57 L.Ed.2d 932 (1978) ("We have no occasion here to decide whether the element of state regulatory direction or authorization of the particular practice, absent in this case, is a factor to be considered in the definition of 'boycott' within the meaning of [15 U.S.C. Sec. 1013(b) ], or whether it comes into play as part of a possible defense under the 'state action' doctrine as elaborated in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny"). But see Ballard v. Blue Shield, 543 F.2d 1075, 1079 (4th Cir.1976) ("Section 1013(b) of the McCarran-Ferguson Act expresses congressional intention to subject boycotts by insurance companies to the Sherman Act. Consequently, there can be no justification for utilizing the principles of Parker v. Brown to impute a contrary intent to Congress.") (footnote omitted). Ballard made clear that West Virginia law specifically authorizes the defendant companies to insure the costs of chiropractic treatment, but the defendants elected not to provide this coverage. 543 F.2d at 1079. It seems to us unduly anomalous to suggest that Congress, in a statute intended to exempt state-regulated insurance practices from the antitrust laws, see Royal Drug, 440 U.S. at 218 n. 18, 99 S.Ct. at 1093 n. 18, intended to subject to the antitrust laws conduct by insurance companies that would be exempt from scrutiny if engaged in by any other entity
 
 
 [11]
 HCEC did not allege that the Blues' boycott of chiropractors was related to the alleged monopolization by the Blues of the health care insurance market. We also understand HCEC to allege that the Blues attempted and conspired with their co-defendants to monopolize the health care provider market by refusing to include chiropractors within their health care service plans. In view of our holding in Part IIA that this conduct was exempted from liability on HCEC's boycott claim under Sec. 1 of the Sherman Act due to the state action doctrine, we similarly conclude that the allegations under Sec. 2 of the Sherman Act of attempt and conspiracy to monopolize by the same conduct were also properly dismissed under the state action doctrine
 
 
 [12]
 HCEC also asserted jurisdiction over the ACR pursuant to Sec. 12 of the Clayton Act, 15 U.S.C. Sec. 22. The district court concluded that this provision did not support jurisdiction over the ACR, HCEC v. IMS, 501 F.Supp. at 980-82, and HCEC has not appealed from this ruling
 
 
 [13]
 Although HCEC was allowed eight months in which to conduct discovery relevant to its assertion of jurisdiction over the ACR, HCEC apparently presented no evidence in opposition to the ACR's motion to dismiss. Although HCEC argues that evidence discovered several years after the district court dismissed the ACR as a party suggests that it had jurisdiction over the ACR, we will not consider on appeal a theory of jurisdiction or evidence which was not before the district court and which was developed after the ACR had been dismissed as a party. Universe Tankships, Inc. v. United States, 528 F.2d 73, 76 (3d Cir.1975); Ludwig v. Marion Laboratories, Inc., 465 F.2d 114, 117 (8th Cir.1972)
 
 
 [14]
 Because we conclude that the ACR did not have sufficient minimum contacts with Iowa to satisfy due process requirements, we do not reach the district court's assumption that the ACR's alleged conduct fell within the Iowa long-arm statute, Iowa Code Sec. 617.3
 
 
 [15]
 Fed.R.Civ.P. 56(e) provides, in relevant part:
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
 
 
 [16]
 Because our disposition of this case leaves no defendants remaining in the case, HCEC's allegation that the district court erred in denying its motion for summary judgment is moot. We similarly have no occasion to consider appellees' argument as an alternative ground for affirmance that HCEC lacks standing or the capacity to bring this suit. Accordingly, "cross-appeal" No. 87-1015 is dismissed