# IN THE SUPREME COURT OF IOWA

No. 10–0010

Filed July 27, 2012

**STEVEN A. MUELLER, BRADLEY J. BROWN, MARK A. KRUSE, KEVIN D. MILLER,** and **LARRY E. PHIPPS,** on Behalf of Themselves and Those Like Situated,

Appellants,

vs.

**WELLMARK, INC.** d/b/a **WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,** An Iowa Corporation; and **WELLMARK HEALTH PLAN OF IOWA, INC.,** An Iowa Corporation,

Appellees.

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

Plaintiffs appeal the dismissal of claims alleging defendants engaged in unlawfully discriminatory and anticompetitive conduct against chiropractors in violation of insurance statutes and the Iowa Competition Law. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Glenn L. Norris of Hawkins & Norris, P.C., Des Moines; Steven P. Wandro of Wandro, Baer & McCarthy, P.C., Des Moines; and Harley C. Erbe of Erbe Law Firm, Des Moines, for appellants.

Hayward L. Draper, Thomas H. Walton, and Patrick B. White of Nyemaster Goode, PC, Des Moines, for appellees.

**WATERMAN, Justice.**

In this complex interlocutory appeal from a putative class action, we must decide whether the district court correctly granted several dispositive motions.  Plaintiffs are doctors of chiropractic who allege they have been victimized by the discriminatory practices of Iowa's largest health insurer, Wellmark, Inc.[1]  The plaintiffs claim Wellmark wrongfully imposes restrictions and pays lower rates for chiropractic services than for equivalent services offered by medical doctors or osteopathic physicians.  Plaintiffs allege that Wellmark not only has violated various insurance regulatory statutes, but also has engaged in unlawful conspiracy and monopolization in violation of the Iowa Competition Law.

First, the district court granted Wellmark's motion to dismiss claims brought under Iowa's insurance regulatory statutes because no private cause of action is provided therein.  We affirm that ruling based on *Seeman v. Liberty Mutual Insurance Co.*, 322 N.W.2d 35, 42–43 (Iowa 1982).  The proper forum for raising alleged violations of those regulatory statutes is through administrative proceedings in the Iowa Division of Insurance.

Second, the district court granted Wellmark's motion for summary judgment on plaintiffs' antitrust claims based on the "state action" exemption found in Iowa Code section 553.6(4) (2009).  We reverse in part because the summary judgment record fails to establish the challenged conduct falls within the exemption.

---

[1]Plaintiffs filed suit against Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc., which is the Health Maintenance Organization of Wellmark, Inc.  The defendants will be collectively referred to as Wellmark.

Third, the district court granted summary judgment on claims alleging Wellmark breached its obligations under a judicially approved national class action settlement in *Love v. Blue Cross Blue Shield Ass'n*, No. 03–21296–CIV (S.D. Fla. Apr. 19, 2008). We affirm because the record contains no evidence Wellmark's implementation of the *Love* settlement violated the Iowa Competition Law.

Fourth, we affirm summary judgment on several specific antitrust claims for reasons explained below. We remand the remaining claims and defenses for further proceedings.

## I. Background Facts and Proceedings.

This litigation began in December 2007 when Steven A. Mueller, D.C., filed a breach-of-contract claim against Wellmark over a $17,376 billing dispute. On May 20, 2008, plaintiffs filed a first amended petition adding plaintiffs, Bradley J. Brown, D.C.; Mark A. Kruse, D.C.; Kevin D. Miller, D.C.; and Larry E. Phipps, D.C. Plaintiffs are doctors of chiropractic who have billed for services provided to patients enrolled in Wellmark health insurance plans. Their amended pleading asserted class action claims on behalf of a putative "class of Iowa-licensed doctors of chiropractic who are citizens of the State of Iowa as of the date of filing."[2] Plaintiffs sought damages and injunctive relief against

---

[2]The chiropractic profession has special significance to this state:

> Chiropractic was founded in Iowa in 1895 by D.D. Palmer, a Canadian immigrant. Palmer was a practitioner of magnetic healing; he had no formal medical training but was well read in both anatomy and physiology. He devoted a great deal of time to the study of the spine and eventually concluded that all disease was the result of abnormal spinal function. Palmer performed his first adjustment in 1895. Subsequent to his initial successes, Palmer's popularity increased and in 1896 he founded the first school of chiropractic in Davenport, Iowa, now known as the Palmer College of [C]hiropractic. One of Palmer's first patients gave the profession its name by combining the Greek words "chiro" (hand) and "praktikos" (done by).

Wellmark, alleging discriminatory and anticompetitive practices that harmed chiropractic doctors. Division I contained the new class action claims, and Division II retained Mueller's individual claim. This appeal only concerns the class action claims in Division I.

Wellmark's business consists of selling health insurance plans to employer groups and providing administrative services to assist others who provide health insurance coverage, such as self-funded governmental entity plans. Wellmark is one of a dozen health insurers in the state, but retains the largest market share. Wellmark creates a network of preferred health care providers, including doctors of chiropractic, medical doctors, and osteopathic doctors, and incentivizes its members to use its preferred provider panel. Wellmark develops its preferred provider panel by entering into contracts with providers that govern the terms and conditions of treatment as well as fee schedules, at times on a take-it-or-leave-it basis. Preferred providers must adhere to these contracts to receive compensation from Wellmark for services provided to Wellmark's members. Preferred provider arrangements are expressly encouraged by the Iowa legislature as a health care cost control mechanism. *See* Iowa Code § 514F.2. The legislature has directed the

---

. . . .

> In 1906 Palmer's son, B.J. Palmer, took over the school and is credited with the development of the chiropractic profession. By 1910 the Palmer School had courses in X-ray studies and was the first to use this new technology to detect spinal misalignments. In 1935 B.J. Palmer established a research clinic at the school and is credited with developing a prototype of the electroencephalogram or EEG.

Kristyn S. Appleby & Joanne Tarver, *Medical Records Review* § 5.16, at 5–74 (4th ed. 2010). Palmer College of Chiropractic is "[k]nown throughout the profession as The Fountainhead [because it] changed the world as the first institution to offer chiropractic education." Palmer College of Chiropractic, *Palmer at a Glance*, http://www.palmer.edu/PalmerAtAGlance/(last visited June 12, 2012).

Iowa Insurance Commissioner to regulate these preferred provider arrangements. *Id.* § 514F.3.

Stated simply, the plaintiffs in this lawsuit allege Wellmark has employed preferred provider arrangements in an unlawfully discriminatory and anticompetitive manner in violation of statutory insurance provisions and state antitrust laws.

Division I of the first amended petition contains five counts, spanning forty pages. Count I provides factual background for the claims that follow. Count II seeks declaratory relief based upon allegations that Wellmark engages in discriminatory practices that violate insurance regulatory provisions contained in the Iowa Code that prevent health insurers from taking actions "on a basis solely related to the [chiropractor's] license." Iowa Code § 514F.2; *accord* Iowa Code §§ 509.3(6), 514.7, 514.23(2), 514B.1(5). Count III pleads Wellmark entered into a contract, combination, or conspiracy to unlawfully restrain trade against chiropractors in violation of section 553.4 of the Iowa Competition Law. Count III seeks money damages. Count IV also seeks money damages, alleging Wellmark "abused [its] monopoly power in the relevant geographic and product markets" to injure plaintiffs in violation of section 553.5 of the Iowa Competition Law.[3] Count V repleads the

---

[3]Wellmark is a purchaser of health services on behalf of its members. *See Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 925 (1st Cir. 1984) ("Blue Shield in essence 'buys' medical services for the account of others . . . ."). Wellmark is thus a "monopsonist," not a monopolist, as plaintiffs plead. *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 1.2(b), at 14 (4th ed. 2011). "A monopsonist is a monopoly buyer rather than seller." *Id.* "Although most antitrust litigation of market power offenses has involved monopoly sellers rather than buyers, monopsony can impose social costs on society similar to those caused by monopoly." *Id.* The distinction is not relevant for the issues decided in this opinion, but may be relevant under other substantive areas of antitrust law. *See id.* at 14–16.

statutory insurance violations alleged in Count II, but seeks injunctive relief.

Division I of the first amended petition alleges Wellmark engaged in substantially similar unlawful conduct for each count in ways that

(a) violate the various provisions of H.F. 2219 (1986 (71 G.A.) ch. 1180)) in their contracts and dealings with chiropractors and chiropractic patients in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark Defendants;

(b) impose definitions of "chiropractic" and "medical necessity" contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark Defendants;

(c) usurp the authority of the Iowa General Assembly, to the detriment of Iowa chiropractors and the treatment and therapy offered to their patients, in requiring the use of and promulgating standards and rules of practice for "Chiropractic Assistants," a category of health care practitioner found nowhere in the present Code of Iowa in Chapters 147 through 158 or elsewhere, and in limiting the employment of certain modes of physiotherapy if not applied by chiropractors or "chiropractic assistants;"

(d) impose maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(e) prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(f) prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(g) agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement

dated April 27, 2007, . . . [*See Love*, No. 03–21296–CIV (S.D. Fla. Apr. 19, 2008)];

(h) enter into agreements with various subdivisions of the State of Iowa to limit or exclude chiropractic coverage from health plans offered to employees of various subdivisions of the State of Iowa, based upon the encouragement of and false information provided by the Wellmark Defendants.

Wellmark moved to dismiss plaintiffs' class action claims on several grounds. Wellmark asserted plaintiffs' insurance claims were within the exclusive jurisdiction of the Iowa Insurance Commissioner and the insurance provisions plaintiffs relied upon do not create a private cause of action. As to plaintiffs' Iowa Competition Law claims, Wellmark alleged (1) it was immune from liability pursuant to Iowa Code section 553.6(4), which exempts "activities or arrangements expressly approved or regulated" by the state; (2) plaintiffs "failed to adequately plead an antitrust injury and therefore lack standing"; and (3) plaintiffs "failed to adequately plead facts plausibly suggesting the existence of an agreement to restrain trade." Plaintiffs resisted all grounds.[4]

On October 22, 2008, the district court granted Wellmark's motion to dismiss plaintiffs' statutory insurance claims, but not their antitrust claims. As to the statutory insurance claims, the district court found no implied cause of action:

---

[4]Wellmark supported its motion with numerous exhibits, including 1986 Iowa Acts ch. 1180 (H.F. 2219), which enacted the insurance provisions relied on by plaintiffs; an affidavit by Wellmark's associate general counsel and assistant board secretary, Michele Druker, attesting Wellmark's preferred provider contracts require insurance commissioner approval; preferred provider agreement prototypes from 2007 and 2001 stamped "Approved" by the insurance commissioner; and the insurance commissioner's administrative regulations governing preferred provider agreements, Iowa Admininstrative Code rule 191—27. The parties stipulated the court should consider these exhibits along with plaintiffs' resistance and supporting exhibits in ruling on Wellmark's motion to dismiss.

The second, third, and fourth factors of the *Seeman* test establish that there is no implied right of action under these statutes. Thus plaintiffs' request for declaratory ruling based on alleged violations of these statutes, their request for injunctive relief based on these statutes, and any damages claims based thereon must be dismissed, because there is no private right of action and jurisdiction rests exclusively with the Commissioner of Insurance.

The district court determined the antitrust claims needed further record development before a ruling could be made:

> At this early stage of the proceedings, the court cannot find, as a matter of law, that the pricing schedules are regulated within the meaning of the statutory exemption. The court has considered the authorities cited by Wellmark, and the different rationales stated therein for finding an exemption to the antitrust laws in cases against insurers. However, many of these cases were decided either at summary judgment, or on a full record made after an evidentiary hearing.

The district court also determined plaintiffs sufficiently pleaded an antitrust injury and conspiracy under Iowa notice pleading standards. The district court ordered the "claims in Division I of the First Amended Petition based on violations of Iowa Code Sections 514F.2, 509.3(6), 514.7, 514.23(2), and 514B.1(5) and other statutes enacted in 1986 Iowa Acts Chapter 1180 are Dismissed" and directed plaintiffs to recast their petition to allege only the antitrust claims.

Plaintiffs' second amended petition did not substantially conform to the district court's order, prompting Wellmark to file a second motion to dismiss or strike, which the district court granted in part. Plaintiffs responded with a third amended petition alleging only the antitrust violations in Division I. Wellmark answered and counterclaimed.

On March 16, 2009, Wellmark moved for summary judgment on Division I (the class action claims) of the third amended petition.[5] Wellmark argued: (1) "The factual record . . . shows that the alleged discriminatory actions plead by Plaintiffs as anti-trust claims . . . fall within the exclusive jurisdiction of the Iowa Insurance Commissioner pursuant to Iowa Code § 553.6(4)"; and (2) "Several of the allegations contained in Plaintiffs' Third Amendment to Petition are contrary to undisputed fact." The motion contained fourteen pages of "undisputed facts" that were supported by 185 pages of affidavits and exhibits, including affidavits by Michele Druker, associate general counsel; Sheryl Nuzum, group leader of network economics; and Linda Blake, group leader for individual and small business underwriting. The affidavits explain that Wellmark submits all provider forms incidental to preferred provider arrangements to the insurance commissioner for approval and that Wellmark bases its provider reimbursement rates on the Resource-Based Relative Value System (RBRVS) and Relative Value Units (RVUs) federally mandated for Medicare.[6] The RVUs assigned by Medicare

---

[5]On April 6, 2009, shortly after Wellmark's motion for summary judgment, the district court severed Division I (the class action claims) from Division II (Dr. Mueller's individual claim) pursuant to the parties' stipulation. Division II remained under the existing case number. The district court ordered plaintiffs to file a recasted third amended petition including only Division I, which would be separately docketed. This is an appeal of the separately docketed case.

[6]In 1989, President George H.W. Bush enacted legislation mandating the Center for Medicare and Medicaid Services (CMS), a federal agency within the United States Department of Human Health and Services, to calculate provider reimbursement rates under the RBRVS. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, § 6102, 103 Stat. 2106 (1989) (codified as amended at 42 U.S.C. § 1395w-4 (2006)). Dr. William Hsiao, a professor of medicine at Harvard, oversaw a research team, which published the RBRVS in 1988. Ann Marie Marciarille & J. Bradford DeLong, *Bending the Health Cost Curve: The Promise and Peril of the Independent Payment Advisory Board*, 22 Health Matrix 75, 106 n.127 (2012). The system attempts to determine rates based upon "the time, effort, skill and stress involved in the[] services." *Id.* The Relative Value Scale Updating Committee (RUC), a group of thirty-one private physicians from different specialties, submits recommendations to the CMS concerning revised values.

require different reimbursement rates for spinal manipulation by chiropractors and by M.D.s and D.O.s, recognizing differences in overhead, training, and malpractice risks among those professions. The Nuzum affidavit noted the different reimbursement rates "are common knowledge in the health care business and would be known by the Iowa Insurance Commissioner when she approves Wellmark's preferred provider arrangements with chiropractors." The exhibits in the summary judgment record include Wellmark's 2001 and 2007 prototype practitioner agreements, policy forms and manuals incorporated into the agreements, insurance commissioner notices approving Wellmark's 2001 and 2007 practitioner agreements, and Wellmark's standard form to administer a governmental entity plan.

Plaintiffs resisted all grounds for summary judgment. Plaintiffs denied forty-five of Wellmark's forty-eight paragraphs of undisputed fact. Most denials stated: "Deny. This paragraph contains inadmissible legal conclusions, opinions without adequate foundation, speculation, and argument. It also fails to state how the affiant [Druker or Nuzum] has or could have personal knowledge of the facts asserted. Iowa R. Evid. 1.981(5)." Plaintiffs supported their resistance with two exhibits containing eighty-nine pages of illustrative Wellmark fee schedules for chiropractors and other medical providers.

Wellmark filed supplementary affidavits to demonstrate its affiants had personal knowledge over the facts asserted. Plaintiffs objected that the supplemental affidavits are hearsay, speculative, and lack adequate

---

American Medical Association, *The RVS Update Committee*, http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/medicare/the-resource-based-relative-value-scale/the-rvs-update-committee.page (last visited June 12, 2012). CMS then accepts or rejects the RUC's recommendations. *Id.*

foundation. Plaintiffs also filed three additional exhibits, Mueller's 1994 participating provider agreement, a 2007 letter documenting provider form amendments, and a letter from Wellmark's vice president indicating Wellmark will begin using the RVU system in 2009.

The district court held a reported hearing on July 31, 2009. On September 18, the district court entered summary judgment dismissing plaintiffs' remaining antitrust claims. Both plaintiffs and Wellmark filed motions to amend the ruling. The district court granted Wellmark's motion to add additional findings of undisputed fact and statutory analysis and denied plaintiffs' motion.

The district court ruled plaintiffs' alleged anticompetitive conduct was exempt from the Iowa Competition Law, under section 553.6(4). The district court applied the two-prong federal "state action" immunity test, concluding:

> In short, the legislature has expressly regulated the activities of Wellmark vis-à-vis provider contracts with chiropractors (and other medical providers). The first prong of the state action exemption is met in this case as to claims arising under the provider agreements.
>
> Turning to the second prong, the court must consider whether this state policy is actively supervised by the state, with special attention paid to whether decisions are made by state authorities or by the private parties themselves. The Insurance Commissioner has enacted comprehensive rules for insurers' agreements with providers under Chapter 514F, which are contained in Chapter 191 of the Iowa Administrative Code, Section 27. Of significance, the rules require approval of prototype preferred provider agreements. 191 I.A.C. 27.5(3). It is undisputed that Wellmark submits its prototype preferred provider agreements with chiropractors to the Insurance Commissioner for approval, and that they have in fact been approved. Many of the allegations in the petition relate to provisions of the provider agreements, or to physical medicine guides that are incorporated into the provider agreements. . . . The court concludes that the provider agreements challenged in this case are actively supervised by a state agency, the Iowa Insurance Commissioner.

With respect to the *Love v. Blue Cross Blue Shield* settlement, the only alleged anticompetitive conduct not approved by the insurance commissioner, the district court granted summary judgment in favor of Wellmark. The district court found the settlement exempt under the *Noerr-Pennington* doctrine and, alternatively, found no genuine issue of material fact as to whether the settlement discriminated against chiropractors. The district court reasoned:

> Under the *Noerr-Pennington* doctrine, settlement agreements approved by a court are immune from antitrust liability, absent a sham. . . . The Love Settlement Agreement, and the court order approving it, appear genuine and valid. Plaintiffs have submitted no countervailing evidence that the settlement is a sham. The court in that case found that the settlement was an arm's length transaction, and that it is reasonable, adequate, and is not the result of collusion between the parties. As such, it is shielded from antitrust liability under *Noerr*.
>
> Secondly, there is no factual basis for an antitrust claim concerning Section 7 of the Love Settlement Agreement. Wellmark's Assistant General Counsel, Michele Druker, submitted a spreadsheet containing every item contained in Section 7 of the settlement agreement. This sets forth a series of procedural requirements, such as availability of fee schedules, reduced precertification requirements, greater notice of policy and procedure changes, etc. Most of the items are being applied to agreements with chiropractors. Some are not applicable. Plaintiffs submitted no opposing affidavits controverting these facts.

Plaintiffs filed an application for interlocutory appeal, which we granted.

## II. Standard of Review.

"We review a district court's ruling on a motion to dismiss for the correction of errors at law." *Dier v. Peters*, 815 N.W.2d 1, 4 (Iowa 2012). A motion to dismiss may be granted when the petition's allegations, taken as true, fail to state a claim upon which relief may be granted. *Geisler v. City Council*, 769 N.W.2d 162, 165 (Iowa 2009) (citing Iowa R. Civ. P. 1.421(1)(*f*)).

We review the district court's grant of summary judgment for correction of errors at law. *Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* The evidence is viewed in the light most favorable to the nonmoving party. *Id.* However, "[w]hen a motion for summary judgment is properly supported, the nonmoving party is required to respond with specific facts that show a genuine issue for trial." *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 245 (Iowa 2006); *accord* Iowa R. Civ. P. 1.981(5).

### III. Whether the District Court Properly Dismissed Plaintiffs' Claims Brought Under the Insurance Statutes for Lack of a Private Cause of Action.

Plaintiffs' first amended petition alleged Wellmark's preferred provider contracts, administration of the Iowa State University health plan, and participation in the *Love* settlement violated Iowa Code sections 509.3(6),[7] 514.7,[8] 514.23(2),[9] 514B.1(5)(*c*),[10] and 514F.2.[11]

---

[7]Iowa Code § 509.3(6) ("A policy of group health insurance may limit or make optional the payment or reimbursement for lawful diagnostic or treatment service by all licensees under chapters 148 and 151 on any rational basis which *is not solely related to the license* under or the practices authorized by chapter 151 . . . . (Emphasis added.)).

[8]Iowa Code § 514.7(3) ("A group subscriber contract may limit or make optional the payment or reimbursement for lawful diagnostic or treatment service by all licensees under chapters 148 and 151 *on any rational basis which is not solely related to the license* under or the practices authorized by chapter 151 or is not dependent upon a method of classification, categorization, or description based upon differences in terminology used by different licensees in describing human ailments or their diagnosis or treatment." (Emphasis added.)).

[9]Iowa Code § 514.23(2) ("A corporation organized and governed by this chapter which becomes a mutual insurer under this section shall continue as a mutual insurer to *be governed by the provisions of section 514.7* and shall also be governed by section 509.3, subsection 6." (Emphasis added.)).

[10]Iowa Code § 514B.1(5)(*c*) ("A prepaid group plan of health care services may limit or make optional the payment or reimbursement for lawful diagnostic or treatment

Section 514F.2 prevents health insurers from utilizing preferred provider arrangements to limit payments "on a basis solely related" to the provider's license—the nub of plaintiffs' claims. The provisions were enacted together in H.F. 2219 in 1986. *See* 1986 Iowa Acts ch. 1180. Wellmark moved to dismiss these claims, arguing H.F. 2219 does not create a private cause of action.

Not all statutory violations give rise to a private cause of action. A private statutory cause of action exists "only when the statute, explicitly or implicitly, provides for such a cause of action." *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999). Plaintiffs concede H.F. 2219 does not expressly create a private cause of action. The issue is whether those provisions implicitly created a private right to sue. *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995).

In our seminal case, *Seeman v. Liberty Mutual Insurance Co.*, we adopted a four-factor test to determine whether a statute provides a private cause of action:

> 1. Is the plaintiff a member of the class for whose benefit the statute was enacted?
>
> 2. Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy?

---

service by all licensees under chapters 148 and 151 *on any rational basis which is not solely related to the license* under or the practices authorized by chapter 151 or is not dependent upon a method of classification, categorization, or description based upon differences in terminology used by different licensees in describing human ailments or their diagnosis or treatment." (Emphasis added.)).

[11]Iowa Code § 514F.2 (permitting provider agreements "provided these systems do not limit or make optional payment or reimbursement for health care services *on a basis solely related to the license* under or the practices authorized by chapter 151 or on a basis that is dependent upon a method of classification, categorization, or description based upon differences in terminology used by different licensees under the chapters of Title IV, subtitle 3, of the Code in describing human ailments or their diagnosis or treatment" (emphasis added)).

3. Would allowing such a cause of action be consistent with the underlying purpose of the legislation?

4. Would the private cause of action intrude into an area over which the federal government or a state administrative agency holds exclusive jurisdiction?

*Marcus*, 538 N.W.2d at 288 (citing *Seeman*, 322 N.W.2d at 38). The *Seeman* court modified the four-factor federal test articulated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26, 36–37 (1975). *Seeman*, 322 N.W.2d at 40. "If any one of these factors is not satisfied, there is no implied cause of action." *Kolbe v. State*, 625 N.W.2d 721, 727 (Iowa 2001); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S. Ct. 2479, 2489, 61 L. Ed. 2d 82, 96 (1979) ("The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.").

*Seeman* is particularly analogous because it analyzed whether insurance provisions in the same subtitle of the Code as those contained in H.F. 2219 created a private cause of action. 322 N.W.2d at 36. In that case, David Seeman sued Liberty Mutual Insurance Co., claiming the insurance company unreasonably delayed payment on the settlement of his workers' compensation claim. *Id.* Seeman brought his lawsuit under section 507B.4 of the Insurance Trade Practices Act, which prohibits unfair methods of competition and deceptive acts by insurance companies. *Id.* at 40. Although we found individual claimants were within the class of persons the Act was intended to benefit, we declined to find a private cause of action because we determined the legislature intended the Insurance Trade Practices Act to be "regulatory in nature." *Id.* at 42. We reasoned there was no existing remedy prior to the legislation for an insurer's bad-faith failure to settle an insurance claim, and the legislative history stated the " 'purpose of the chapter is to

*regulate* trade practices.' " *Id.* at 41–42 (quoting Iowa Code section 507B.1 (emphasis added)). Moreover, the chapter provided the insurance commissioner with specified administrative powers to investigate, adjudicate, remedy, and sanction prohibited acts of unfair practices. *Id.* at 42; *see also Scotts v. Eveleth,* 688 N.W.2d 803, 808–09 (Iowa 2004) (holding no private cause of action exists when "Iowa Code section 272.2 gives the board the exclusive authority to '[e]nforce rules adopted by the board through revocation or suspension of a license, or by other disciplinary action against' a teacher"); *Young,* 538 N.W.2d at 289 (relying on the existence of administrative remedies in Iowa Code chapter 22, the Open Records Act, to find no private cause of action). Plaintiffs' statutory insurance claims fail here for the same reasons as those under *Seeman.*

The legislature enacted H.F. 2219 to benefit chiropractors as well as consumers. But, in light of *Seeman,* the history of H.F. 2219, and the available administrative remedies, we conclude the remaining factors do not support recognition of a private cause of action. Accordingly, the district court properly dismissed plaintiffs' statutory insurance claims.

Prior to H.F. 2219, chiropractors were excluded from Iowa statutes regulating health insurance coverage. Judge Stuart, a former Iowa Supreme Court Justice, summarized the state of Iowa law on this issue in 1980:

> Chapter 514 of the Iowa Code clearly expresses a policy excluding chiropractic services from coverage by health care service corporations. Throughout that chapter, the state legislature repeatedly stated precisely the particular services covered. No mention is ever made of chiropractors, the practice of chiropractic or Chapter 151 of the Iowa Code which governs aspects of the practice of chiropractic, including licensing. The Court believes that the omission of any mention of chiropractic coverage in Chapter 514 directly

suggests that the legislature intended to prohibit coverage of their activities by health care service corporations.

*Health Care Equalization Comm. of the Iowa Chiropractic Soc'y v. Iowa Med. Soc'y*, 501 F. Supp. 970, 989–90 (S.D. Iowa 1980), *aff'd*, 851 F.2d 1020 (8th Cir. 1988). The subsequent 1986 amendments expressly sought to "provid[e] for optional payment by corporations subject to chapters 509, 514, and 514B for services performed by chiropractors." 1986 Iowa Acts ch. 1180. Plaintiffs contend this history indicates the legislature intended to provide chiropractors private rights of enforcement. We disagree.

Before H.F. 2219 was enacted, chiropractors had no statutory or common law remedy if health care insurers declined to cover their services. In *Seeman*, we found chapter 507B did not create a private cause of action, in part because, before that chapter's enactment, individuals had no private common law or statutory remedy against insurers for the conduct proscribed by that chapter. 322 N.W.2d at 41–42. We reasoned that, if the legislature wanted to create a private cause of action when none previously existed, presumably it would have done so expressly. *See id.* The same logic applies here with even greater force. H.F. 2219 was enacted four years after our decision in *Seeman.* We presume the legislature was aware of our holding in *Seeman* refusing to recognize a private cause of action in related insurance provisions. *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 600 (Iowa 2011) (" 'The legislature is presumed to know the state of the law, including case law, at the time it enacts a statute.' " (quoting *State v. Jones*, 298 N.W.2d 296, 298 (Iowa 1980))). Given that timing, we decline to infer from legislative silence in the 1986 amendments the intent to provide chiropractors or

other licensed health care professionals a private right of action for violation of the insurance statutes.

Plaintiffs in this case are suing under insurance statutes regarded under *Seeman* as "essentially regulatory in nature." 322 N.W.2d at 42. We reach the same conclusion here as in *Seeman*: The legislature "intended only to invest the insurance commissioner with administrative enforcement power . . . . Accordingly, we hold that the legislature implicitly intended the insurance commissioner's powers to be the exclusive means of enforcing" the statute. *Id.* at 43. The legislature provided the insurance commissioner with extensive administrative powers over health insurance practices. Iowa Code section 514F.3 directs the insurance commissioner to "adopt rules for preferred provider contracts and organizations" concerning "but not . . . limited to . . . preferred provider arrangements and participation requirements, health benefit plans, and civil penalties." The legislature explained its reasoning:

> Presently, preferred provider organizations, i.e., arrangements wherein a health benefit plan provides for treatment by select providers, are *unregulated*. This bill would authorize the division of insurance to adopt rules *regulating* those entities, in particular, to adopt the national association of insurance commissioners' model provision.

H.F. 2307, 72d G.A., Reg. Sess. § 604 Explanation (Iowa 1988) (emphasis added). This history confirms the legislature intended H.F. 2219 to be regulatory in nature.

Pursuant to the legislature's authorization, the insurance commissioner has adopted administrative rules regulating preferred provider arrangements and detailing administrative enforcement powers. *See* Iowa Admin. Code r. 191—27 (governing preferred provider arrangements). The insurance commissioner determined civil penalties

for violating preferred provider arrangements regulations "shall be imposed in the amount, and pursuant to the procedure, set forth in Iowa Code sections 507B.6, 507B.7, and 507B.8." *Id.* r. 191—27.7. The operative statutes and rules authorize the insurance commissioner to issue charges, hold hearings, and levy civil penalties up to $50,000 for improper preferred provider arrangements, all subject to judicial review. *See* Iowa Code §§ 507B.6–8. *Seeman* relied on such administrative procedures in holding the Insurance Trade Practices Act did not create an implied private cause of action. 322 N.W.2d at 42 (citing Iowa Code sections 507B.6, 507B.7, 507B.8, the enforcement powers in the Insurance Trade Practices Act).

Section 514F.3 specifically commands the insurance commissioner to adopt rules and procedures to regulate preferred provider arrangements. Plaintiffs attempt to distinguish *Seeman* by arguing in that case the legislature enacted the administrative remedies, while here the insurance commissioner promulgated the regulations and administrative remedies. This is a distinction without a difference for determining whether an implied private right of action exists. We rejected this distinction in *Eveleth,* which held "[s]ection 272.2 clearly suggests that this provision was intended to be a regulatory measure designed to provide the board with authority to suspend or revoke a teacher's license in those situations when violations of its provisions occur." 688 N.W.2d at 809; *see also Rowen v. LeMars Mut. Ins. Co. of Iowa,* 230 N.W.2d 905, 909 (Iowa 1975) ("When the legislature has given an administrative agency jurisdiction to entertain the particular controversy, we have held the jurisdiction is exclusive and must be exhausted before resort to the courts . . . .").

Plaintiffs are not left without a remedy absent an implied cause of action. Plaintiffs may use chapter 17A administrative remedies to enforce H.F. 2219—they must simply turn to the insurance commissioner first. Plaintiffs may petition the commissioner for a declaratory order as to the legality of Wellmark's allegedly discriminatory activities. *See* Iowa Code § 17A.9. Plaintiffs could then seek judicial review of the ruling. *Id.* Wellmark's exhibits show H.F. 2219 has been the subject of at least two administrative proceedings resulting in declaratory rulings.

Plaintiffs under certain circumstances also may initiate "contested case" proceedings under chapter 17A to obtain an evidentiary hearing for their alleged grievances. *Id.* § 17A.2(5) (defining "contested case" as a "proceeding including but not restricted to ratemaking, price fixing, and licensing in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing"); *see, e.g.*, *Lifeline Ambulance, Inc. v. Iowa Ins. Div.*, 505 N.W.2d 186, 187 (Iowa 1993) (reviewing insurance commissioner contested-case ruling to uphold an HMO's decision to terminate a group health insurance plan under section 514B.17).

Finally, plaintiffs can petition for "other agency action" pursuant to section 17A.2(2), which also is subject to judicial review. Iowa Code § 17A.19(10); *see also Travelers Indem. Co. v. Comm'r of Ins.*, 767 N.W.2d 646, 650 (Iowa 2009) (insurance commissioner's adjudication of a workers' compensation premium dispute reviewed as "other agency action").

The insurance commissioner oversees a uniform, statewide scheme to regulate preferred provider arrangements and other health insurer

activities.[12] The insurance commissioner is permitted to utilize his expertise and specialization to make an administrative record to resolve disputes within his jurisdiction. On judicial review of the commissioner's ruling, the commissioner will be a party and the reviewing court's adjudication will apply statewide to the health insurance industry. We do not believe the legislature intended to create a private cause of action to allow civil juries to second-guess conduct approved by the insurance commissioner and subject to judicial review from administrative proceedings.

We conclude our legislature chose to provide the Iowa Insurance Commissioner with exclusive powers to regulate health insurance practices under these statutes. For these reasons, we hold Iowa Code sections 509.3(6), 514.7, 514.23(2), 514B.1(5)(*c*), and 514F.2, enacted as part of H.F. 2219, do not create a private cause of action.

**IV. Whether the District Court Erred by Applying the State Action Exemption, Iowa Code Section 553.6(4), to Grant Summary Judgment Against Plaintiffs on Their State Antitrust Claims.**

Plaintiffs' third amended petition alleges that discriminatory provisions in Wellmark's preferred provider arrangements constitute a

---

[12]New legislation, effective July 1, 2012, prohibits health insurers from imposing larger copayments for chiropractic services than for services by medical doctors or osteopaths. 2012 Iowa Legis. Serv. H.F. 2465, § 36 (West 2012) (to be codified at Iowa Code § 514C.29) ("[A] policy, contract, or plan providing for third-party payment or prepayment of health or medical expenses shall not impose a copayment or coinsurance amount on an insured for services provided by a doctor of chiropractic licensed pursuant to chapter 151 that is greater than the copayment or coinsurance amount imposed on the insured for services provided by a person engaged in the practice of medicine and surgery or osteopathic medicine and surgery under chapter 148 for the same or a similar diagnosed condition even if a different nomenclature is used to describe the condition for which the services are provided."). Legislation and regulations administered by the Iowa Insurance Division have uniform applicability statewide. By contrast, plaintiffs' allegations in this litigation target the conduct of a single health insurer.

conspiracy to restrain trade against chiropractors in violation of section 553.4 and an abuse of monopoly power in violation of section 553.5. Plaintiffs' alleged anticompetitive conduct can be grouped into three categories: (1) procedural requirements and conditions of treatment, (2) fee payment schedules, and (3) administration of state self-funded group plans that typically have identical preferred provider panels.

Wellmark moved for summary judgment, asserting its preferred provider arrangements are exempt from plaintiffs' antitrust claims pursuant to section 553.6(4). This section provides that the Iowa Competition Law "shall not be construed to prohibit . . . activities or arrangements expressly approved or regulated by any regulatory body or officer acting under authority of this state." Iowa Code § 553.6(4). The district court granted Wellmark's motion, and we now are called upon to review the correctness of this ruling.

We have applied the so-called "state action" exemption of section 553.6(4) in two prior cases. *Nw. Bell Tel. Co. v. Iowa Utils. Bd.*, 477 N.W.2d 678, 685–86 (Iowa 1991); *Neyens v. Roth*, 326 N.W.2d 294, 298–99 (Iowa 1982). As we noted in those two cases, private anticompetitive conduct is exempt from federal antitrust laws if (1) the conduct is undertaken pursuant to a " 'clearly articulated and affirmatively expressed' " state policy and (2) the policy is " 'actively supervised' " by the state itself. *See Nw. Bell*, 477 N.W.2d at 685 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S. Ct. 937, 943, 63 L. Ed. 2d 233, 243 (1980)); *Neyens*, 326 N.W.2d at 298 (same). We also observed in *Neyens* that the Iowa Competition Law has a uniformity clause. *See* Iowa Code § 553.2 (stating that the Iowa Competition Law "shall be construed to complement and be harmonized with the applied laws of the United States which have the same or

similar purpose"); *Neyens*, 326 N.W.2d at 298; *see also Comes v. Microsoft Corp.*, 646 N.W.2d 440, 452 (Iowa 2002) (Cady, J., dissenting) (noting that in section 553.2, the legislature provided "a specific rule of construction" for interpreting the Iowa Competition Law); *Nw. Bell*, 477 N.W.2d at 686.

"The general rule is that exemptions from coverage of competition laws are to be narrowly applied." *Neyens*, 326 N.W.2d at 298. The state action exemption is an affirmative defense as to which the defendant bears the burden of proof. *See Nw. Bell*, 477 N.W.2d at 685 ("The first prong of the state action exemption requires a *showing . . . .*") (Emphasis added.); *see also F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 638, 112 S. Ct. 2169, 2179, 119 L. Ed. 2d 410, 425 (1992) ("[T]he party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme."); *Yeager's Fuel, Inc. v. Penn. Power & Light Co.*, 22 F.3d 1260, 1266 (3d Cir. 1994) ("[S]tate action immunity is an affirmative defense as to which [party asserting immunity] bears the burden of proof."); 1 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 4:4, at 4-62 (4th ed. Supp. 2012) ("State action immunity is an affirmative defense, and the defendant has the burden of establishing its eligibility for that defense."). Whether the state action exemption is established is a question of law for the court. *Trigen Okla. City Energy Corp. v. Okla. Gas & Elec. Co.*, 244 F.3d 1220, 1225 (10th Cir. 2001); *TEC Cogeneration, Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1567 (11th Cir.), *modified*, 86 F.3d 1028 (1996).

Plaintiffs argue that we should apply the state action exemption to this case as it is currently interpreted by the federal courts. *See Ticor Title Ins. Co.*, 504 U.S. at 634, 638, 112 S. Ct. at 2177, 2179, 119

L. Ed. 2d at 423, 425 (holding that, for the exemption to apply, "the potential for state supervision [must be] realized in fact" and "the State [must] exercise[] sufficient independent judgment and control so that the details of the rates or prices [are] established as a product of deliberate state intervention, not simply by agreement among private parties").[13] Wellmark counters that we should apply the "plain language" of the Iowa version of the exemption. Both sides argue that they would prevail even under the other side's legal interpretation of the exemption.

We agree with plaintiffs that, even accepting Wellmark's view of the state action exemption, it does not apply here. Different governmental reviews are for different purposes. When a library checks in a book, it is verifying that the book was returned, not approving the contents of the book. When the county grants a marriage license, it is indicating that the couple may be lawfully married, not that they are necessarily a good match. So too here, the present record indicates that, when the insurance division approves Wellmark's preferred provider forms, it is indicating those forms comply with the legal requirements of chapter 514F and its implementing regulations. It is not comparing specific chiropractor rates to physician rates, which are not even actually disclosed in those forms. Although Wellmark uses the RBRVS system created for Medicare to reimburse chiropractors, Wellmark retains discretion to apply a "Wellmark determined adjustment factor" to alter the rates. Wellmark did not disclose this adjustment factor to the insurance commissioner.

---

[13]We note the United States Supreme Court recently granted certiorari in a hospital state action immunity case, *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 663 F.3d 1369 (11th Cir. 2011), *cert. granted*, 80 U.S.L.W. 3707 (U.S., June 25, 2012) (No. 11–1160, 11A811).

It is true that the State of Iowa encourages health insurers to enter into preferred provider arrangements and requires a prototype of any such arrangement to be submitted for prior review by the insurance division. *See* Iowa Admin. Code r. 191—27.5(3). It is also true that Wellmark submitted its preferred provider forms to the division and that those forms were approved.

Nonetheless, for the "activity or arrangement" to be exempt from the antitrust laws, Wellmark must establish that it was "expressly approved or regulated" by a regulatory body or an officer acting under state authority. Iowa Code § 553.6(4). To put it another way, the alleged anticompetitive practice must be " 'expressed as state policy' " and " 'actively supervised by the state.' " *Nw. Bell*, 477 N.W.2d at 685 (citation omitted); *Neyens*, 326 N.W.2d at 298–99; *see also Cal. Retail Liquor Dealers*, 445 U.S. at 105, 100 S. Ct. at 943, 63 L. Ed. 2d at 243; *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 260 (3d Cir. 2001) ("It is the conduct that violates the antitrust laws that states must 'actively supervise' in order for *Parker* immunity to attach."). "Rubber stamp approval of private action does not constitute state action." *A.D. Bedell*, 263 F.3d at 260.

Wellmark has not established the insurance division reviews preferred provider agreements in order to regulate the rates paid to different classes of health care providers such as doctors and chiropractors. Rather, it appears the review is designed to assure fair and equitable access to the preferred provider network and to protect nonparticipants in the network. *See, e.g.,* Iowa Admin. Code rs. 191—27.4 (allowing but limiting incentives for use of preferred providers), 27.5 (listing participation requirements). In short, the purpose of the insurance division's review is to regulate the overall relationship between

preferred provider participants and nonparticipants, not to monitor rates paid to or conditions imposed upon different categories of preferred provider panelists. This is consistent with the authority conferred by the underlying statute, which provides:

> The commissioner of insurance shall adopt rules for preferred provider contracts and organizations, both those that limit choice of specific provider and those that do not. The rules adopted shall include, but not be limited to, the following subjects: preferred provider arrangements and participation requirements, health benefit plans, and civil penalties.

Iowa Code § 514F.3.

> Thus, the initial section of the relevant regulations explains:

> The purpose of this chapter is to encourage health care cost containment while preserving quality of care by allowing health care insurers to enter into preferred provider arrangements and by establishing minimum standards for preferred arrangements and the health benefit plans associated with those arrangements.

Iowa Admin. Code r. 191—27.1. As this section reveals, the underlying purpose of the chapter is to set minimum standards, not to regulate rate differentials. The next section of the regulations sets forth a series of definitions. *Id.* r. 191—27.2. The third section then states what a preferred provider arrangement shall contain "at minimum":

> *a.* Establish the amount and manner of payment to the preferred provider. The amount and manner of payment may include capitation payments for preferred providers.

> *b.* Include mechanisms which are designed to minimize the cost of the health benefit plan. These mechanisms may include among others:

> (1) The review or control of utilization of health care costs.

> (2) A procedure for determining whether health care services rendered are medically necessary.

> *c.* Ensure reasonable access to covered services available under the preferred provider arrangement.

*Id.* r. 191—27.3(1). Hence, a preferred provider arrangement must establish an amount and manner of payment, and a procedure for determining medical necessity, and presumably would be rejected by the insurance division if it lacked these items. But, there is no indication that the insurance division reviews and approves the actual rates of payment or regulates the specific terms of access to chiropractors as compared with physicians.[14] By way of analogy, our appellate rule 6.903(2) requires the appellant to file a brief containing a table of contents, a table of authorities, a statement of the issues, a routing statement, a statement of the case, a statement of the facts, an argument section, and a conclusion. Our clerk's office typically rejects briefs that do not meet these minimum standards, but this does not mean that by filing the brief the clerk approves of the appellant's argument.

The remaining regulations generally are intended to protect nonparticipants and participants who use noncovered services from unfair discrimination. Thus, rule 27.3(2) provides, "A preferred provider arrangement shall not unfairly deny health benefits for medically necessary covered services." Rule 27.3(3) provides that the regulations will cover preferred provider arrangements even when not sponsored by licensed insurers. Rule 27.4 enshrines additional nondiscrimination protections:

> **27.4(1)** A health care insurer may issue a health benefit plan which provides for incentives for covered persons to use the health care services of a preferred provider. The policies or subscriber agreements shall contain at least all of the following provisions:

---

[14]The fee schedules that Wellmark submitted were merely "Illustrative," according to the charts, comparing "Facility" and "Non-Facility" and "PPO/Indemnity" and "HMO."

*a.* A provision that if a covered person receives emergency services specified in the preferred provider arrangement and cannot reasonably reach a preferred provider, emergency services rendered during the course of the emergency will be reimbursed as though the covered person had been treated by a preferred provider, subject to any restriction which may govern payment by a preferred provider for emergency services.

*b.* A provision which clearly identifies the differentials in benefit levels for health care services of preferred providers and benefit levels for health care services of nonpreferred providers.

**27.4(2)** If a health benefit plan provides differences in benefit levels payable to preferred providers compared to other providers, such differences shall not unfairly deny payment for covered services and shall be no greater than necessary to provide a reasonable incentive for covered persons to use the preferred provider.

So does rule 27.5:

**27.5(1)** A health care insurer may place reasonable limits on the number or classes of preferred providers which satisfy the standards set forth by the health care insurer, provided that there is no discrimination against providers on the basis of religion, race, color, national origin, age, sex or marital status.

**27.5(2)** Notwithstanding any other provision of this chapter, a health care insurer may issue policies or subscriber agreements which provide benefits for health care services only if the services have been rendered by a preferred provider, provided the program has met all standards imposed by the commissioner for availability and adequacy of covered services.

**27.5(3)** A health care insurer shall file with the commissioner for the commissioner's prior review a prototype of any preferred provider arrangement and of the health care plan's policy, contract, or subscriber agreement associated with the arrangement, together with any changes in the prototype. Use of the prototypical preferred provider arrangement and health care plan's policy, contract, or subscriber agreement is conditioned upon approval of these documents by the commissioner.

Rule 27.6 states that "[a] health insurer subject to this chapter shall be subject to and is required to comply with all other applicable laws and rules and regulations of this state." Rule 27.7 indicates that civil

penalties for violation of this chapter "shall be imposed in the amount, and pursuant to the procedure, set forth in Iowa Code sections 507B.6, 507B.7, and 507B.8." Lastly, rule 27.8 contains certain whistleblower-type protections:

> **27.8(1)** A health care insurer shall not prohibit a participating provider from or penalize a participating provider for discussing treatment options with covered persons, irrespective of the health care insurer's position on the treatment options, or from advocating on behalf of covered persons within the utilization review or grievance processes established by the health care insurer or a person contracting with the health care insurer.
>
> **27.8(2)** A health care insurer shall not penalize a provider because the provider, in good faith, reports to state or federal authorities any act or practice by the health care insurer that, in the opinion of the provider, jeopardizes patient health or welfare.

These regulations are not directed to the regulation of rate differentials for particular services. Their purpose, rather, is to insure that health insurers do not abuse their overall relationship with patients and providers through the use of preferred provider plans. Thus, if a clinic decided to sue Wellmark under the Iowa Competition Law alleging that Wellmark had engaged in prohibited section 553.5 monopolization by excluding it from a preferred provider arrangement, the section 553.6(4) state action exemption might well apply.[15] But, it does not

---

[15]This point is illustrated by *Health Care Equalization Committee of the Iowa Chiropractic Society v. Iowa Medical Society*, 851 F.2d 1020 (8th Cir. 1988). In that case, chiropractors sued Wellmark's predecessor for antitrust violations, challenging its refusal to include chiropractic services in health care service plans. *Health Care Equalization Comm.*, 851 F.2d at 1022. The court found the state action exemption available, noting that under state law at that time, "the exclusion of chiropractors from health care service plans was not merely contemplated by the State of Iowa, but compelled." *Id.* at 1026. The Eighth Circuit thus found the state action exemption applied, not because some state regulation existed in the general area, but because the decisions being challenged as anticompetitive were directly covered by regulation. Nowadays state law mandates the inclusion rather than the exclusion of chiropractic

appear that the legislature has decided generally to remove the setting of reimbursement rates by health insurance companies from the operations of the marketplace or from claims under the Iowa Competition Law.

A United States Supreme Court decision is on point.  In *Patrick v. Burget*, an Oregon physician who had lost privileges at a hospital for allegedly anticompetitive reasons brought suit under the antitrust laws. 486 U.S. 94, 96–98, 108 S. Ct. 1658, 1660–61, 100 L. Ed. 2d 83, 89–90 (1988).  Oregon, like other states, had a state-mandated and state-regulated peer-review process, which the hospital had followed in attempting to terminate the physician's privileges.  *Id.* at 97, 101–02, 108 S. Ct. at 1661, 1663–64, 100 L. Ed. 2d at 89–90, 92–93.  Nonetheless, the Supreme Court rejected the state action defense in a unanimous decision because the record showed that the various state agencies did not review the merits of individual peer-review decisions, as opposed to overall peer-review procedures.  As the Supreme Court put it, "The Health Division's statutory authority over peer review relates only to a hospital's procedures; that authority does not encompass the actual decisions made by hospital peer-review committees."  *Id.* at 102, 108 S. Ct. at 1664, 100 L. Ed. 2d at 93.  Here, likewise, the regulatory scheme does not address the fairness of specific rates paid to chiropractors vis-à-vis doctors.

As noted by the parties, Wellmark filed a lengthy submission on Friday, July 27, 2001, which the division stamped "approved" on the very next business day, Monday, July 30.  This did not occur because the division's employees took shortcuts in their work.  It happened because

---

services, *see, e.g.*, Iowa Code section 514.7(3), but the conceptual point remains the same.

the scope of review called for by the law and the regulations was limited. Wellmark offered no affidavit or depostion testimony of the insurance commissioner or any employee of the insurance division involved in approving Wellmark's submissions. The insurance division conducted no hearing. There is no evidence in this record the insurance division has ever rejected or required revisions to the reimbursement rates or terms of access in a health insurer's preferred provider arrangement. Nor does the record reflect the insurance division has ever requested additional information concerning rate differentials. We conclude Wellmark failed to establish a regulatory review sufficient to exempt Wellmark under section 553.6(4) from an antitrust lawsuit alleging that it conspired with physicians to underpay chiropractors or impose unfair terms on them.

To a large extent, the affidavits submitted by Wellmark are an effort to defend the merits of its pricing decisions rather than an attempt to show that the state reviews and regulates those prices. For example, the Nuzum affidavit explains for fifteen paragraphs how Wellmark uses the RBRVS system and why it is fair to chiropractors. In the last paragraph, the affiant attempts to tie everything together by stating:

> The total amounts available for provider reimbursement by Wellmark are ultimately determined by state regulations requiring that provider fees be high enough to provide reasonable access for members to each provider type, including chiropractors.

Thus, Wellmark's theory of implicit rate approval asserts that the company has to pay chiropractors enough because if chiropractor fees were too low, chiropractors would not join the preferred provider arrangement, and there would not be "reasonable access to covered services," as required by rule 191—27.3(1). In this indirect way,

according to Wellmark, the insurance division regulates rates. We do not believe this satisfies section 553.6(4). Demonstrating that regulations provide, in some indirect way, an incentive for Wellmark to compensate chiropractors adequately is different from demonstrating the insurance commissioner in fact regulated and approved the specific rate differentials at issue here.

Under Wellmark's reasoning, even if all the health insurance companies doing business in Iowa had engaged in a blatant horizontal conspiracy to cap the rates they paid for chiropractic care, no one could seek redress under the antitrust laws because of the state action exemption. Thus, health insurance companies in Iowa would be free to engage in the kind of conduct for which ordinary citizens go to jail. For the foregoing reasons, we reverse the district court's summary judgment granting Wellmark a blanket exemption under section 553.6(4) from charges that it engaged in anticompetitive price-fixing or term-fixing schemes.

**V. Whether the District Court Correctly Granted Summary Judgment on Claims Relating to the *Love v. Blue Cross Blue Shield* Settlement.**

Plaintiffs' third amended petition alleges Wellmark conspired to restrain trade against chiropractors by entering into an agreement with over ninety-five percent of Iowa medical and osteopathic doctors to "numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007." The *Love v. Blue Cross Blue Shield* settlement resulted from a national class action by all medical and osteopathic doctors against the state Blue Plans, including Wellmark. *See Love,* No. 03–21296–CIV (S.D. Fla. Apr. 19, 2008). The settlement was not reviewed or approved by the Iowa

Insurance Commissioner and thus is not subject to immunity under section 553.6(4). The district court granted summary judgment in favor of Wellmark, finding no genuine issue of material fact as to whether Wellmark discriminated against chiropractors when implementing the *Love* settlement. We agree with the district court's ruling.

The order approving the *Love* settlement agreement states in part:

> E. The Court has held a hearing to consider the fairness, reasonableness, and adequacy of the Settlement, has been advised of all objections to the Settlement and has given fair consideration to such objections.
>
> F. The Settlement is the product of good faith, arm's length negotiations between the Representative Plaintiffs and the Signatory Medical Societies and their counsel, on one hand, and the Blue Parties and their counsel, on the other hand.
>
> G. The Settlement, as provided for in the Settlement Agreement, is in all respects fair, reasonable, adequate, is not the product of collusion between the Parties, and is otherwise proper and in the best interests of the Class.

Druker's affidavit in support of Wellmark's motion states:

> No term of the Love Settlement Agreement binds Wellmark not to extend to chiropractors the same or similar terms, or to deny chiropractors the benefit of any perceived advantageous changes in business practices, as are provided to M.D.'s and D.O.'s under that agreement.

As the district court accurately described, Druker also

> submitted a spreadsheet containing every item contained in Section 7 of the settlement agreement. This sets forth a series of procedural requirements, such as availability of fee schedules, reduced precertification requirements, greater notice of policy and procedure changes, etc. Most of the items are being applied to agreements with chiropractors. Some are not applicable.

Accordingly, Wellmark's record evidence presents facts demonstrating Wellmark does not provide preferential treatment to medical and osteopathic doctors as a result of the *Love* settlement.

Plaintiffs' resistance fails to set forth facts that show Wellmark has implemented the *Love* settlement in a manner discriminatory to chiropractors. *See Green,* 713 N.W.2d at 245. In response to Druker's affidavit, which was incorporated into Wellmark's statement of undisputed facts, plaintiffs stated:

> Denied. This is legal argument in Exhibit 7 the class is defined as "any and all Physicians, Physician Groups and Physician Organizations . . . ." According to the Settlement Agreement, Ü 1.85, " 'Physician' means an individual duly licensed by a state licensing board as a Medical Doctor or Doctor of Osteopathy and shall include both Participating Physicians and Non-Participating Physicians." The State of Iowa recognizes that a Doctor of Chiropractic is a "Physician." Iowa Code § 135.1(4) (2007): " 'Physician' means a person licensed to practice medicine and surgery, osteopathic medicine and surgery, osteopathy, chiropractic, podiatry or optometry under the laws of this state." Chiropractors were deliberately excluded from the Agreement, Exhibit 7.

Plaintiffs' response merely acknowledges the *Love* settlement did not include chiropractors; it does not controvert Wellmark's record evidence. Plaintiffs offered no affidavit testimony or other evidence to controvert Wellmark's evidence showing it implemented the *Love* settlement in a nondiscriminatory manner.

Accordingly, we conclude the plaintiffs failed to generate a genuine issue of material fact precluding summary judgment on their claims based on the *Love* settlement.

## VI. Other Defenses to State Antitrust Claims.

Wellmark raised several other defenses to plaintiffs' Iowa Competition Law claims in the dispositive motions it filed below. Generally, the district court did not reach those defenses because it disposed of the claims on the grounds already discussed. With three

exceptions, we believe those defenses should be addressed further on remand.

First, we believe the district court properly rejected Wellmark's argument that the plaintiffs did not suffer an actionable "antitrust injury."[16]  Wellmark takes the position that, because the plaintiffs are suing as disadvantaged *sellers* rather than disadvantaged *buyers*, they have not suffered an injury "of the type sought to be compensated by antitrust laws." *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 199 (Iowa 2007 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538, 103 S. Ct. 897, 908–09, 74 L. Ed. 2d 723, 738 (1983)).  The antitrust laws are as concerned about abuse of monopsony power to pay prices below a competitive level as they are about abuse of monopoly power to charge prices above a competitive level.  The seller to the monopsony has been harmed as much as the buyer from the monopoly.  *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104–05 (3d Cir. 2010) (holding that a hospital had alleged antitrust injury based on its receipt of artificially depressed reimbursement rates from a dominant insurer and noting that "the defendants' argument reflects a basic misunderstanding of the antitrust laws"); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322, 127 S. Ct. 1069, 1076, 166 L. Ed. 2d 911, 920 (2007) ("The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and claims of monopsonization.").  Hence, we reject Wellmark's "antitrust injury" defense.

---

[16]Wellmark reurges this argument on appeal as an alternative ground for affirming dismissal of the antitrust claims.

Second, by contrast, plaintiffs' counsel conceded at oral argument before us that his clients cannot pursue a claim against Wellmark for *unilaterally* deciding to pay chiropractors less. We agree. *See W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 103 (concluding that, if the insurer had been "acting alone, [the health care provider] would have little basis for challenging the reimbursement rates[, and a] firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services"). Merely paying less (because one is a monopsonist) or charging more (because one is a monopolist) does not violate the antitrust laws. There must be some prohibited conspiracy or exclusionary conduct as well. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP.*, 540 U.S. 398, 407, 124 S. Ct. 872, 879, 157 L. Ed. 2d 823, 836 (2004) (stating that "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is . . . not unlawful" and "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of an anticompetitive *conduct*"). Accordingly, we affirm the summary judgment in favor of Wellmark on any claim that Wellmark's pricing decisions violated section 553.5 of the Iowa Code.

Third, Wellmark urges us to separately uphold the dismissal of certain claims related to treatment conditions contained in the preferred provider agreements. Wellmark contends those claims are "waived" because plaintiffs failed either here or below to rebut Wellmark's evidence demonstrating that the conditions were nondiscriminatory. In its summary judgment order, the district court found Wellmark's facts were undisputed, although it did not specifically grant summary judgment on

that basis because it decided that all the antitrust claims were barred by section 553.6(4).

We agree with Wellmark that it is entitled to dismissal of these claims. We therefore affirm the summary judgment as to plaintiffs' allegations that (1) Wellmark "arbitrarily imposed riders on the policies of patients" seeking spinal treatment when the patient had prior chiropractic care, (2) promulgated "standards and rules of practice for 'Chiropractic Assistants,'" and (3) imposed a definition of "chiropractic" to restrict covered chiropractic treatments.

Blake's affidavit in support of Wellmark's motion states:

> With regard to "riders" that limit coverage when a member discloses preexisting joint or bone conditions, whether such an exclusion or policy amendment will be sought is determined by written underwriting guidelines. These guidelines make no distinction between prior conditions that were treated by a chiropractor as opposed to those that were treated by other medical professionals.

Druker's affidavit states:

> Wellmark does not and has not ever implemented standards and rules of practice for "Chiropractic Assistants" or created a limitation that certain modes of physiotherapy must be applied by "Chiropractic Assistants".

Wellmark also showed that its definition "chiropractic" was based on Iowa law.

Plaintiffs' resistance challenged only the admissibility and competency of Wellmark's affidavits. Plaintiffs conceded Wellmark uses the statutory definition of "chiropractic" in its provider forms. Plaintiffs identified no evidence to avoid summary judgment on these claims. We therefore affirm summary judgment here.

Apart from the three areas we have just discussed, we conclude that any other defenses that Wellmark may have to the Iowa Competition Law claims would be better addressed on remand.

## VII.  Disposition.

For the reasons stated, we affirm the district court's ruling granting Wellmark's motion to dismiss plaintiffs' statutory insurance claims.  We reverse the summary judgment granted to Wellmark that was based upon the state action exemption.  We affirm the district court's summary judgment dismissing claims that Wellmark violated section 553.5 of the Iowa Competition Law with respect to any unilateral payment decisions regarding chiropractors.  We also affirm the district court's summary judgment dismissing claims based on the *Love* settlement, medical spine riders, and definitions of "chiropractic assistant" and "chiropractic."  We remand the case for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**